## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:20-cr-287 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| PATRICK MASON, JR., | ) | |
| | ) | |
| DEFENDANT. | ) | |

On April 22, 2020, a criminal complaint was filed charging defendant Patrick Mason, Jr. ("defendant" or "Mason") with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (Doc. No. 1 ["Compl."].) On June 11, 2020, an indictment issued charging Mason with one count of felon in possession and one count of possession of a firearm by a person with a prior misdemeanor domestic violence conviction, in violation of 18 U.S.C. §§ 922(g)(9) and 924(a)(2). (Doc. No. 20 ["Ind"].)

Mason now moves to suppress evidence seized during an encounter with police on January 29, 2020. (Doc. No. 35 ["MTS Evid."].) He also seeks an order suppressing statements he made to law enforcement following his arrest on April 23, 2020. (Doc. No. 36 ["MTS Stm."].) The United States of America (the "government") opposes both motions. (Doc. No. 39 ["MTS Evid. Opp'n"]; Doc. No. 40 ["MTS Stm. Opp'n"].) The Court conducted an evidentiary hearing on the motions on September 30, 2020, and, at the conclusion of the hearing, the Court took the matters under advisement. For the reasons that follow, both motions are DENIED.

I. MOTION TO SUPPRESS EVIDENCE

A.   Factual Background

At approximately 2:40 pm on January 29, 2020, the Willoughby Hills Police Department received a call reporting two people unresponsive in a motor vehicle parked at the gas pumps of the Shell Gas Station at 2770 Bishop Road. Patrol Officer Anthony Mino testified that he was one of the officers dispatched to the scene. The dashboard camera from Mino's cruiser recorded the encounter, and the recording was played at the hearing. (Defendant's Exhibit ["D. Ex."] B.)

The car in question was parked next to the gas pumps with the engine turned off. Officer Craig Anderson, also of the Willoughby Police Department, was already on scene when Officer Mino arrived and was attempting to wake the subjects by yelling into the vehicle. Officer Anderson's police cruiser was parked in front of the vehicle. As he approached, Officer Mino noticed that the windows were fogged up but that he could barely make out the outline of Mason, who was seated in the passenger seat and slumped to the right, and a female, who was in the driver's seat and slumped to the left. Neither individual was moving. Using his baton, Officer Mino tapped on the window and yelled into the vehicle, but both occupants remained unconscious and unresponsive. He planned to break the window to gain entry to the vehicle because he believed that the vehicle's occupants had overdosed on drugs and/or alcohol and were in need of medical assistance.

Forced entry ultimately proved unnecessary as the female in the driver's seat eventually sat up partially conscious. At the officers' urging, the woman attempted to unlock the door but kept hitting the lock button.[1] Eventually, she managed to unlock the door, and Officer Mino

---

[1] The taillights can be seen flashing and the horn can be heard as the female fumbled with the locking mechanism.

2

opened the passenger side door. He looked into the vehicle and observed Mason still unconscious. He was breathing but was not responsive to Officer Mino's efforts to wake him. The vehicle omitted a strong smell of alcohol, and Officer Mino observed that Mason's hand was down the front of his pants over a black gun holster. Officer Mino testified that this was a "red flag" that a weapon might be present in the vehicle, and he is heard on the video recording sharing his concern with others on the scene. He also noticed ammunition on the floor, as well as an open container of gin located on the console, which was consistent with the alcohol smell in the vehicle. He continued to try to wake Mason and administered a sternal rub, which temporarily caused Mason to open his eyes before he fell unresponsive again.

With the assistance of emergency medical technicians ("EMTs") and fire department personnel on the scene, Office Mino removed Mason from the vehicle and a gun dropped from Mason's pants. Officer Mino took Mason, who had awakened during the transfer, to the ground to render aid, as he verbally signaled that he had discovered a gun.

While Officer Mino and EMTs were attending to Mason, an unidentified EMT instructed the other occupant to remain in the vehicle. The EMT asked her whether Mason had taken anything, but she was either unable or unwilling to provide any information. As she exited the vehicle, she is seen on the video staggering before she is secured by Officer Anderson and removed out of view of the cruiser camera. In the background, a conversation between the female driver and Officer Anderson can be heard wherein she stated that she could not tell him what Mason consumed before she admitted that she had been drinking. From the audio, it was clear that she was having difficulty answering the officers' basic questions regarding her identity and address.

3

Once the weapon was secured and Mason was detained, Officer Mino ran Mason's license, determined that he had outstanding warrants, and arrested him. The female driver was also arrested and taken into custody, as she was believed to be intoxicated and had become belligerent and combative with Officer Anderson. Because both of the vehicle's occupants had been taken into custody, the vehicle was towed to an impoundment lot where its contents were inventoried. In addition to the aforementioned ammunition and open alcohol container, the inventory search revealed an ammunition box.

Mason now moves the Court for an order suppressing all evidence obtained during the January 29, 2020 warrantless search of the vehicle. He argues that officers engaged in an unlawful investigatory search, as they lacked reasonable suspicion that criminal activity was afoot or probable cause to arrest him when he "was only peacefully sleeping in the vehicle's passenger seat." (Mot. Evid. at 215.[2]) He suggests that all evidence obtained by the police constitutes "tainted fruit" of the "poisonous tree" that must be suppressed under the exclusionary rule. (*Id*)

### B. Consensual Encounters

The Fourth Amendment protects citizens against unreasonable searches and seizures. U.S. Const. amend. VI. A seizure occurs when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen[.]" *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

"Not every interaction between an officer and a citizen is a seizure within the meaning of the Fourth Amendment, however." *United States v. Russ*, 772 F. Supp. 2d 880, 885 (N.D. Ohio

---

[2] All page numbers refer to the page identification number generated by the Court's electronic docketing system.

2011). "There are three types of permissible encounters between police officers and citizens: '(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause.'" *Id.* (quoting *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010) (further quotation marks and citation omitted). Investigative detentions and arrests are considered seizures "and thus must be conducted consistent with Fourth Amendment principles." *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997). A consensual encounter, however, is not a seizure and, therefore, the Fourth Amendment is not implicated, "as long as [an] officer's actions do not convert it into an investigative detention." *Id.*

A consensual encounter transforms into a seizure when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). "Circumstances indicative of a seizure include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009) (quoting *Mendenhall*, 446 U.S. at 554).

The government maintains that the initial encounter with Willoughby Hills police officers was consensual and cites *United States v. Townsend*, 206 F. App'x 444 (6th Cir. 2006), a case the Court finds persuasive and instructive. In *Townsend*, police responded to a complaint of a suspicious person "asleep or passed out" at a gas pump. Police arrived at the gas station and

found the defendant "slumped in the driver's seat." *Id*. at 445–46. When the defendant did not respond to verbal inquiries, the officer shined his flashlight into the vehicle and noticed what appeared to be the handle of a handgun between the driver's seat and the console. He then opened the vehicle's door and removed the keys from the ignition. As the officer was removing the keys, defendant awoke, reached for his keys, and tussled with the officer before he was secured. After determining that defendant had outstanding warrants and was not permitted to possess a weapon, he was arrested. *Id*. at 446.

The court determined that, until defendant awoke, the interaction with police "can only be characterized as a permissible consensual encounter. Although [defendant] being asleep, could hardly have consented to the encounter, the officers' plain view observations in a public place did not entail any impermissible intrusion into [defendant's] privacy." *Id*. at 448. And once the officers observed the gun, the court ruled that the officers had reasonable suspicion to search the vehicle. *Id*. In so ruling, the court underscored the fact that the defendant

> had been asleep at the wheel of a parked vehicle in front of an open-for-business gas pump for an extended period of time. He did not respond to verbal inquiry. Under these circumstances, it was not unreasonable for [the officer] to suspect that [defendant] had not simply dozed off but was intoxicated, and may have driven the vehicle, or may have been about to drive the vehicle, intoxicated—conduct potentially constituting a criminal offense. Moreover, the observed presence of a handgun within [defendant's] reach clearly enhanced the suspiciousness of the circumstances and called for swift and sure action.

*Id*

Similarly here, the officers' plain view observation of two individuals passed out or incapacitated in a vehicle parked at a gas pump, in the middle of the afternoon, cannot be considered an intrusive encounter. When the occupants did not respond to repeated efforts to wake them, it was not unreasonable for the officers to suspect that Mason and his companion had

not simply dozed off but had likely overdosed on drugs or alcohol. After the door was opened and Officer Mino smelled alcohol and observed a gun holster and open container of alcohol in the vehicle, the officers clearly possessed reasonable suspicion to believe that one or more criminal offenses had been committed, justifying an investigative detention. And, as was the case in *Townsend*, the observation of the gun holster and ammunition, "clearly enhanced the suspiciousness of the circumstances and called for swift and sure action." *Townsend*, 206 F. App'x at 448.

At the hearing, defense counsel argued that this was an investigative detention from the beginning, and that the officers had already made up their minds before opening the vehicle door that they were going to locate evidence of criminal activity and arrest the vehicle's occupants. But the evidence offered at the hearing told a different story. Officer Mino testified credibly that he and Officer Anderson were responding to a potential overdose situation, and that their focus was the wellbeing of the individuals in the vehicle and their likely need of medical attention. His testimony was bolstered by the video that showed him quickly administering a sternal rub to Mason while being assisted by emergency medical personnel who had also been deployed to the scene. It was clear from the video that the officers were responding to an emergency medical situation.

Defense counsel also argued at the hearing that *Townsend* can be distinguished from the present case because, in *Townsend*, the officer observed the gun *before* he opened the vehicle's door, whereas Officer Mino did not see the holster and ammunition, or smell the alcohol from the opened container, until *after* he opened the door. True, this is a fact that distinguishes the Sixth Circuit's panel decision in *Townsend*. But the Sixth Circuit has also made clear that a

police officer may properly open a vehicle door without a warrant if he is acting in his community-caretaking role. *United States v. Lewis*, 869 F.3d 460, 462–63 (6th Cir. 2017).

In *Lewis*, officers responded to reports that a woman was intoxicated in a store and attempted to find her a safe ride home in lieu of arresting her. When she indicated that her boyfriend was waiting in the parking lot in his truck, officers approached the boyfriend's vehicle to determine whether he would drive the woman home. When they found him asleep in the truck, an officer opened the vehicle's door and the officer observed a clear plastic baggie that contained drugs. Because the officer was acting in his caretaking role, the court ruled that "any limited intrusion on [the driver's] privacy from simply opening the door was reasonable[,]" even though they did not knock on the windows or attempt to speak with the driver first. *Id*. at 463–4 ("True, the officers apparently did not knock on the truck window or attempt to speak with Lewis before opening the door, which might have been more respectful of Lewis's privacy.")[3] Similarly here, because the officers were responding to a suspected drug or alcohol overdose—a duty well within an officer's community caretaker role—they were justified in opening the door without reasonable suspicion or probable cause.

Counsel also suggested that the officers did not utilize "the least intrusive means reasonably available," but, instead, employed threatening tactics that would have led the reasonable person to believe that he was not free to leave. Specifically, he noted that both officers used loud voices and aggressive pounding on the windows, and that Officer Anderson parked his cruiser in front of the vehicle. Counsel also suggested that the officers should have

---

[3] Of course, the facts in the case before the Court are more compelling for the application of the community-caretaker exception to the warrant requirement than in *Lewis*. Officers first forcibly rapped on the windows and shouted loudly but were unable to wake Mason before they attempted to enter the vehicle.

8

spoken with the female driver to obtain additional information before they tried to gain entry to the vehicle to assist Mason. In short, counsel insisted that the "officers could have spent a little more time investigating this stop before they opened [up] the doors and found the weapons and the liquor."

While it is true that the officers used raised voices and persistent knocking, such actions were necessary, and unlikely to threaten anyone, given the fact that the vehicle's occupants were oblivious to their presence and would not wake. And even though the female driver did eventually regain consciousness, it was evident from the video that she was intoxicated and incoherent. She had difficulty unlocking the car door and answering basic questions, and she was in no condition to assist the officers with Mason or provide them with any useful information that would have helped Mason. Taking the time in an emergency situation to speak with an obviously incapacitated and belligerent individual would have been both irresponsible and pointless.

The fact that Officer Anderson parked his cruiser in front of the vehicle does not change the calculus. "The Sixth Circuit has held that blocking an individual's car 'to determine the identity of the occupants and maintain the status quo while obtaining this information [is] a warrantless *Terry* seizure.'" *Russ*, 772 F. Supp. 2d at 888 (quoting *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009)). Even though Officer Anderson parked in front of the vehicle, Officer Mino testified that he did not park directly behind the vehicle. Instead, the video confirmed that he parked his cruiser "off to the right" of the vehicle. In other words, had the vehicle's participants even been aware of the officers' presence, which they clearly were not as they were

unconscious, their ability to leave the scene by backing up was not impeded by the presence of the officers. *See, e.g., Russ*, 772 F. Supp. 2d at 889 (distinguishing *See* on similar grounds).

Only two police officers (Officer Mino and Officer Anderson) approached the car before the female driver unlocked the door and Officer Mino opened it, and there is no evidence that either officer displayed his weapon or threatened the vehicle's occupants. The other individuals on scene—EMTs and at least three other police officers—did not approach the vehicle before the door was opened, and there is no evidence that they engaged in any threatening behavior.[4] Under these circumstances, the Court finds that the initial encounter did not involve the "threatening presence of several officers[.]" *See Jones*, 562 F.3d at 772. Instead, it was a permissible consensual encounter that did not develop into an investigatory detention until the vehicle's door was opened and evidence of illegal conduct was plainly observed. *See United States v. Espinal*, No. 1:11-cr-60, 2011 WL 7004195, at *7 (N.D. Ga. Aug. 29, 2011) ("an officer's approach of a car parked in a public place does not constitute an investigatory stop or higher echelon Fourth Amendment seizure") (quotation marks and citation omitted); *United States v. Scott*, 368 F. App'x 392, 394 (4th Cir. 2010) (Fourth Amendment not implicated where officers approached defendant slumped over his vehicle and attempted to rouse him).

### C.     Reasonable Suspicion

But even if the encounter between Mason and the police was not consensual and could be characterized as a *Terry* stop, the officers had the reasonable suspicion necessary to perform the stop. With respect to an investigatory detention, or *Terry* stop, an officer can stop and briefly

---

[4] After Officer Mino gained entry to the vehicle and Mason was removed, at least three other police officers are seen in the video assisting the EMTs who were attending to Mason. It is not clear from the record when they arrived on scene.

detain a person when the "'officer has reasonable, articulable suspicion that [a] person *has been*, is, or is about to be engaged in criminal activity.'" *United States v. Atchley*, 474 F.3d 840, 847 (6th Cir. 2007) (emphasis in original) (quoting *United States v. Hensley*, 469 U.S. 221, 227, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985)). Stated differently, reasonable suspicion exists when, "based on the totality of the circumstances", a police officer has a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Baldwin*, 114 F. App'x 675, 679 (6th Cir. 2004). In assessing the totality of the circumstances, police officers may "draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008) (quotation marks and citation omitted).

Officer Mino, a 28-year veteran of the force, served on a drug task force with the State of Illinois and had also worked undercover narcotics for ten years in collaboration with agents from numerous federal agencies. He testified that, in his experience, the presence of a vehicle parked at a gas station in the middle of the afternoon with two occupants passed out inside suggested that the occupants were impaired by narcotics and/or by excessive alcohol consumption. As a panel of the Sixth Circuit observed when confronted with similar circumstances, such facts would lead a reasonable officer to conclude that the driver had driven, or was about to drive, the vehicle while impaired—"conduct potentially constituting a criminal offense." *Townsend*, 206 F. App'x at 448.

Under the circumstances known to the officers both before and when they were on the scene, they were entitled to briefly stop the occupants and make the necessary inquires to

11

establish defendant's and the female driver's identities and to confirm or dispel suspicions of criminal activity. *Adams v. Williams*, 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972); *see United States v. Young*, 707 F.3d 598, 605–06 (6th Cir. 2012). This would have included speaking with the occupant and, if necessary, ordering the occupants out of the vehicle. *See Md. v. Wilson*, 519 U.S. 408, 414–15, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997). Once the officers had opened the vehicle's door and smelled the alcohol and observed the opened gin container, the gun holster, and ammunition, their suspicions would have been confirmed and probable cause to arrest would have existed.

For the foregoing reasons, the Court finds that: (1) the initial encounter between officers and Mason was consensual and within bounds of the community caretaker exception to the warrant requirement, and thus no reasonable suspicion or probable cause was required; and that, (2) in any event, there was reasonable suspicion to justify an investigatory detention. Accordingly, the Court will not suppress the evidence found in the vehicle.

## II. MOTION TO SUPPRESS STATEMENTS

### A. Factual Background

Mason was subsequently arrested and was interviewed by law enforcement officials following his arrest. Joanna Nagy, an employee of the State of Ohio Adult Parole Authority and a full-time member of the FBI Violent Crimes Task Force, was assigned to investigate Mason's gun offenses and testified at the evidentiary hearing. She testified that she and another officer arrested Mason on April 23, 2020 and took him into custody. Mason was arrested in his grandparent's driveway, and it was Officer Nagy's understanding that Mason had just retuned from his place of employment, where he worked the third shift. Mason was interviewed at the

Cleveland FBI headquarters by Officer Nagy and FBI Special Agent Andy Burke. Officer Nagy testified that, on the way to FBI headquarters, Mason was taken to a Dunkin' Donuts where a coffee and bagel was purchased for him. Officer Nagy saw Mason drink the coffee and eat at least half of the bagel while on route to FBI headquarters.

Upon arriving at the FBI building, Mason was placed in an interview room. The interview that followed was recorded, and the recording was played at the hearing. (Government Exhibit ["Gov. Ex."] 1.) The interview room was carpeted and contained a desk. A coffee cup and bag from Dunkin' Donuts are visible on the desk. The entire interview lasted approximately 3 hours, but only the first 30 minutes of the interview addressed the charges in this case. The balance of the interview was devoted to another criminal matter involving Mason. As the interview took place during the coronavirus pandemic, Mason and the interviewing officers wore masks throughout the interview.

Before the interview began, Officer Nagy asked Mason if he was comfortable, and he indicated that he was "a little sleepy." Officer Nagy addressed a question Mason posed in the car ride to the FBI building as to why the case was being brought in federal court. After explaining why he was being charged under federal law,[5] Officer Nagy orally read Mason his *Miranda* rights. She then presented him with a printed version of the rights and asked him to sign the waiver attached to it. Mason reviewed the form and asked her to fill in certain parts of the form, and Officer Nagy is seen on the video writing on the waiver. Mason then asked if he had to sign the waiver. Agent Burke informed him that he was not required to sign it, but he explained that

---

[5] Specifically, Officer Nagy explained that Mason was a convicted felon and that, as such, it was a violation of federal law for him to possess a firearm. Mason probed further about why this matter was being treated as a federal case before Officer Nagy explained that Mason did not have to agree with her about the law, or whether it applied to him.

13

they could not speak with Mason further about his case unless he agreed to waive his right to remain silent. Agent Burke also explained that Mason could decide which of their questions he wanted to answer and could end the interview at any time. Mason then asked what would happen if he refused to sign, and Agent Burke explained that, if he did not sign, they could not speak with him and they would leave. Mason asked if he would be able to go home at that point, and he was informed him that, regardless of whether he spoke with them, he would not be permitted to leave but would be processed by the U.S. Marshals. At the conclusion of this back and forth exchange, Mason signed the waiver.

Agent Burke began the interview by asking Mason about his criminal record, and Mason confirmed that he did have experience in the state criminal justice system, including, at least, two prior felonies that were F-4 or greater.[6] Agent Burke then explained why the federal government would consider charging an individual federally for gun-related offenses, and how sentences are determined under the federal sentencing guidelines.

They then discussed with Mason the details surrounding his arrest in January 2020, and Mason volunteered what he remembered from his arrest and even posed his own questions. His comments and questions were lucid and clear, as were his answers to the officers' questions. Officer Nagy testified that, throughout the interview, Mason appeared to understand what she and Agent Buke were saying and the questions they were posing. She described his demeanor as alert and that this alertness continued throughout the interview. At no time did Mason advise the

---

[6] The indictment identifies two burglary convictions and one robbery conviction as predicates for the felon in possession charge. (Ind. at 61.) Mason also testified that he had 4 or 5 low-level state felony convictions. Among these misdemeanor offenses was a 2017 conviction for domestic violence that serves as the predicate offense for Count 2 of the indictment. (*See id*. at 62.)

officers that he was tired or unable to continue with the interview, nor did he ever request an attorney or refuse to answer any questions. No one offered him leniency or threatened him.

In his motion, Mason insists that any statements he made during his custodial interview must be suppressed because his "mental acuity was lacking as he was in an exhausted and in a tired state [of] mind after coming off of work on the third shift with a mask covering his face" and that "the interrogation was conducted in a location unfamiliar with [him], a sterile interrogation room, and conducted by two different FBI agents." (MTS Stm. at 238.) According to Mason, "[w]hen one takes all the foregoing into consideration[,]" his "waiver of his Fifth Amendment rights was not 'voluntarily, knowingly and intelligently' made." (*Id.*)

### B. Custodial Interrogations

The Fifth Amendment provides that an individual may not be "compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. In order to safeguard that right, law-enforcement officers must inform a suspect of his rights under the Fifth Amendment—including his right to remain silent in response to the officers' questions, and his right to the presence of an attorney—before conducting a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). A person may waive his Fifth Amendment rights, provided he does so voluntarily and knowingly and intelligently. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986). A waiver is voluntarily if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception[.]" *Berghuis v. Thompkins*, 560 U.S. 370, 382, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) (quoting *Burbine*, 475 U.S. at 421).

A waiver is "knowing and intelligent" when "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 382-83 (quoting *Burbine*, 475 U.S. at 421). To aid in that inquiry, the Court looks to factors such as "the suspect's 'age, experience, education, background, and intelligence,'" *United States v. Montgomery*, 621 F.3d 568, 573 (6th Cir. 2010) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979)), as well as "the length and nature of the questioning, the advice [given] regarding *Miranda* rights, and the use of physical punishment, such as deprivation of food or sleep." *United States v. Hampton*, 572 F. App'x 430, 433 (6th Cir. 2014) (citing *Murphy v. Ohio*, 551 F.3d 485, 511 (6th Cir. 2009)). In evaluating both prongs, the Court "must consider the 'totality of the circumstances surrounding the interrogation.'" *Id*. (quoting *Burbine*, 475 U.S. 421).

"In cases involving sleep deprivation or intoxication, courts most often focus on the perceptions of the involved officers and not the defendant's statement of mind, in order to determine whether a defendant's statement is 'knowing' and 'voluntary.'" *Hampton*, 572 F. App'x at 434 (collecting cases, including *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986) ("The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion.")). The "important inquiry is whether the interviewing officers perceived there to be any 'impairments' to a knowing and intelligent waiver, when the totality of the circumstances are considered." *Id*. at 435.

In *Hampton*, a Sixth Circuit panel rejected the defendant's argument that that he was sleep deprived and unable to voluntarily, knowingly, and intelligently waive his *Miranda* rights. While officers found the defendant asleep in the interrogation room, once the interview resumed,

16

the defendant was awake, coherent, and appeared to understand everything they said to him. Even though the defendant had not slept in over 24 hours, the court found that the defendant's "coherent and alert nature in responding to police questioning weigh[ed] in favor of finding" a knowing and intelligent waiver. *Id*. Further, the court found the waiver to be voluntary—and, in doing so, rejected the defendant's claim of coercion—because the act of waking the defendant up to continue the interview was not tantamount to coercion. *Id*.

Here, the Court finds that the government has carried its burden of demonstrating that Mason voluntarily, knowingly, and intelligently waived his *Miranda* rights prior to the interview. First, Mason acted voluntarily when waiving his *Miranda* rights. There is no evidence of any coercion, intimidation, or deception on the part of the interviewing officers. They answered Mason's questions honestly, including the question of whether he would be permitted to leave, and there is no evidence that Mason was ever promised leniency or threatened in any way. *Cf. United States v. Johnson*, 351 F.3d 254, 261 (6th Cir. 2003) ("Police promises of leniency and threats of prosecution can be objectively coercive.") In response to his inquires, it was made clear to Mason that he did not need to sign the *Miranda* waiver or speak with them. Based on the totality of the circumstances, the Court finds that Mason voluntarily waived his right to remain silent.

Second, Mason knowingly and intelligently waived his *Miranda* rights. Before the interview, he was advised of his *Miranda* rights both orally and in writing. Mason reviewed the written waiver and even asked Officer Nagy to fill in some missing items on the form. He also inquired as to whether he was required to sign the waiver, and he confirmed that he had prior

17

experience in the state criminal justice system. At no time did Mason indicate that he wished to terminate the interview or speak to an attorney.

Officer Nagy testified credibly that Mason appeared to understand his rights as they were explained to him, and that, once the interrogation began and throughout the interview, Mason appeared alert and able to understand the questions that were put to him. Further, her observations were borne out by the record, as Mason's responses to the agent's questions, as well as the questions he posed, were clear, lucid, and coherent. At no point on the video did he appear exhausted, nor did it appear that his mental acuity was lacking. Mason was provided with coffee and food before the interview started, the tenor of the interview was pleasant and cordial, and the officers did not employ any tactics that were coercive. Based upon the totality of the circumstances, the Court finds that Mason's waiver of his *Miranda* rights was knowing, voluntary, and intelligent.

Accordingly, Mason's custodial statements will not be suppressed.

### III. CONCLUSION

For the foregoing reasons, Mason's motions to suppress (Doc. Nos. 35, 36) are DENIED.

**IT IS SO ORDERED**.

Dated: October 20, 2020

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**